# MADSEN ET AL. *v.* WOMEN'S HEALTH CENTER, INC., ET AL.

No. 93–880.   Argued April 28, 1994—Decided June 30, 1994

754

REHNQUIST, C. J., delivered the opinion of the Court, in which BLACK-MUN, O'CONNOR, SOUTER, and GINSBURG, JJ., joined, and in which STEVENS, J., joined as to Parts I, II, III–E, and IV. SOUTER, J., filed a concurring opinion, *post*, p. 776. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 777. SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, in which KENNEDY and THOMAS, JJ., joined, *post*, p. 784.

*Mathew D. Staver* argued the cause for petitioners. With him on the briefs were *Jeffery T. Kipi* and *Christopher J. Weiss.*

*Talbot D'Alemberte* argued the cause for respondents. With him on the brief was *Susan England.*

*Solicitor General Days* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Assistant Attorney General Hunger, Deputy Solicitor General Bender, Beth S. Brinkmann, Anthony J. Steinmeyer,* and *Jonathan R. Siegel.* *

---

*Briefs of *amici curiae* urging reversal were filed for the American Family Association by *Scott L. Thomas;* for the Christian Legal Society et al. by *Edward McGlynn Gaffney, Jr., Steven T. McFarland,* and *Victor G. Rosenblum;* for Defendants Operation Rescue et al. by *Jay Alan Sekulow, Walter M. Weber, Mark N. Troobnick, James M. Henderson, Sr., Thomas Patrick Monaghan, Keith A. Fournier,* and *John Stepanovich;* for the National Right to Life Committee, Inc., by *James Bopp, Jr.,* and *Richard E. Coleson;* and for the Rutherford Institute by *John W. Whitehead* and *Alexis I. Crow.*

Briefs of *amici curiae* urging affirmance were filed for the State of Florida et al. by *Robert A. Butterworth,* Attorney General of Florida, *Ger-*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners challenge the constitutionality of an injunction entered by a Florida state court which prohibits antiabortion protesters from demonstrating in certain places and in various ways outside of a health clinic that performs abortions. We hold that the establishment of a 36-foot buffer zone on a public street from which demonstrators are excluded passes muster under the First Amendment, but that several other provisions of the injunction do not.

I

Respondents operate abortion clinics throughout central Florida. Petitioners and other groups and individuals are

ald B. Curington and Gypsy Bailey, Assistant Attorneys General, Eleni M. Constantine, and Richard Cordray, and by the Attorneys General for their respective States as follows: Grant Woods of Arizona, Gale A. Norton of Colorado, Richard Blumenthal of Connecticut, Robert A. Marks of Hawaii, Roland W. Burris of Illinois, Pamela Carter of Indiana, Michael E. Carpenter of Maine, J. Joseph Curran, Jr., of Maryland, Scott Harshbarger of Massachusetts, Hubert H. Humphrey III of Minnesota, Joseph P. Mazurek of Montana, Deborah T. Poritz of New Jersey, Frankie Sue Del Papa of Nevada, Tom Udall of New Mexico, G. Oliver Koppell of New York, Michael F. Easley of North Carolina, Lee Fisher of Ohio, Theodore E. Kulongoski of Oregon, Jeffrey B. Pine of Rhode Island, Charles W. Burson of Tennessee, Dan Morales of Texas, Jeffrey L. Amestoy of Vermont, Darrell V. McGraw, Jr., of West Virginia, and James E. Doyle of Wisconsin; for the American College of Obstetricians and Gynecologists et al. by Carter G. Phillips, Joseph R. Guerra, Ann E. Allen, and Paul M. Smith; for the Center for Reproductive Law & Policy et al. by Lenora M. Lapidus; for the National Abortion Federation et al. by Elaine Metlin, Lynn I. Miller, Roger K. Evans, and Eve W. Paul; for the NOW Legal Defense and Education Fund et al. by Martha F. Davis, Deborah A. Ellis, Sally F. Goldfarb, and Burt Neuborne; and for People for the American Way et al. by Joseph N. Onek, Richard McMillan, Jr., Elliot M. Mincberg, Lawrence S. Ottinger, Steven M. Freeman, Marc D. Stern, Lois C. Waldman, Richard F. Wolfson, Ronald Lindsay, Elaine R. Jones, Theodore M. Shaw, and Charles Stephen Ralston.

Laurence Gold and Walter Kamiat filed a brief for the American Federation of Labor and Congress of Industrial Organizations as amicus curiae.

engaged in activities near the site of one such clinic in Melbourne, Florida. They picketed and demonstrated where the public street gives access to the clinic. In September 1992, a Florida state court permanently enjoined petitioners from blocking or interfering with public access to the clinic, and from physically abusing persons entering or leaving the clinic. Six months later, respondents sought to broaden the injunction, complaining that access to the clinic was still impeded by petitioners' activities and that such activities had also discouraged some potential patients from entering the clinic, and had deleterious physical effects on others. The trial court thereupon issued a broader injunction, which is challenged here.

The court found that, despite the initial injunction, protesters continued to impede access to the clinic by congregating on the paved portion of the street—Dixie Way—leading up to the clinic, and by marching in front of the clinic's driveways. It found that as vehicles heading toward the clinic slowed to allow the protesters to move out of the way, "sidewalk counselors" would approach and attempt to give the vehicle's occupants antiabortion literature. The number of people congregating varied from a handful to 400, and the noise varied from singing and chanting to the use of loudspeakers and bullhorns.

The protests, the court found, took their toll on the clinic's patients. A clinic doctor testified that, as a result of having to run such a gauntlet to enter the clinic, the patients "manifested a higher level of anxiety and hypertension causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures." App. 54. The noise produced by the protesters could be heard within the clinic, causing stress in the patients both during surgical procedures and while recuperating in the recovery rooms. And those patients who turned away because of the crowd to return at a

later date, the doctor testified, increased their health risks by reason of the delay.

Doctors and clinic workers, in turn, were not immune even in their homes. Petitioners picketed in front of clinic employees' residences; shouted at passersby; rang the doorbells of neighbors and provided literature identifying the particular clinic employee as a "baby killer." Occasionally, the protesters would confront minor children of clinic employees who were home alone.

This and similar testimony led the state court to conclude that its original injunction had proved insufficient "to protect the health, safety and rights of women in Brevard and Seminole County, Florida and surrounding counties seeking access to [medical and counseling] services." *Id.*, at 5. The state court therefore amended its prior order, enjoining a broader array of activities. The amended injunction prohibits petitioners[1] from engaging in the following acts:

> "(1) At all times on all days, from entering the premises and property of the Aware Woman Center for Choice [the Melbourne clinic] . . . .
>
> "(2) At all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot of the Clinic.
>
> "(3) At all times on all days, from congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within [36] feet of the property line of the Clinic . . . . An exception to the 36 foot buffer zone is the area immediately adjacent to the Clinic on the east . . . . The [petitioners] . . . must remain at least [5] feet from the Clinic's east line.

---

[1] In addition to petitioners, the state court's order was directed at "Operation Rescue, Operation Rescue America, Operation Goliath, their officers, agents, members, employees and servants, and . . . Bruce Cadle, Pat Mahoney, Randall Terry, . . . and all persons acting in concert or participation with them, or on their behalf." App. 56.

Another exception to the 36 foot buffer zone relates to the record title owners of the property to the north and west of the Clinic. The prohibition against entry into the 36 foot buffer zones does not apply to such persons and their invitees. The other prohibitions contained herein do apply, if such owners and their invitees are acting in concert with the [petitioners]. . . .

"(4) During the hours of 7:30 a.m. through noon, on Mondays through Saturdays, during surgical procedures and recovery periods, from singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the Clinic.

"(5) At all times on all days, in an area within [300] feet of the Clinic, from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring of the [petitioners]. . . .

"(6) At all times on all days, from approaching, congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within [300] feet of the residence of any of the [respondents'] employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner, temporarily or otherwise, obstruct the entrances, exits or driveways of the residences of any of the [respondents'] employees, staff, owners or agents. The [petitioners] and those acting in concert with them are prohibited from inhibiting or impeding or attempting to impede, temporarily or otherwise, the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.

"(7) At all times on all days, from physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, crowding or assaulting persons entering or

leaving, working at or using services at the [respondents'] Clinic or trying to gain access to, or leave, any of the homes of owners, staff or patients of the Clinic . . . .

"(8) At all times on all days, from harassing, intimidating or physically abusing, assaulting or threatening any present or former doctor, health care professional, or other staff member, employee or volunteer who assists in providing services at the [respondents'] Clinic.

"(9) At all times on all days, from encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein." *Operation Rescue* v. *Women's Health Center, Inc.*, 626 So. 2d 664, 679–680 (Fla. 1993).

The Florida Supreme Court upheld the constitutionality of the trial court's amended injunction. 626 So. 2d 664. That court recognized that the forum at issue, which consists of public streets, sidewalks, and rights-of-way, is a traditional public forum. *Id.*, at 671, citing *Frisby* v. *Schultz*, 487 U. S. 474, 480 (1988). It then determined that the restrictions are content neutral, and it accordingly refused to apply the heightened scrutiny dictated by *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983) (To enforce a content-based exclusion the State must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end). Instead, the court analyzed the injunction to determine whether the restrictions are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Ibid.* It concluded that they were.

Shortly before the Florida Supreme Court's opinion was announced, the United States Court of Appeals for the Eleventh Circuit heard a separate challenge to the same injunction. The Court of Appeals struck down the injunction, characterizing the dispute as a clash "between an actual prohibition of speech and a potential hinderance to the free exercise of abortion rights." *Cheffer* v. *McGregor*, 6 F. 3d 705,

711 (1993). It stated that the asserted interests in public safety and order were already protected by other applicable laws and that these interests could be protected adequately without infringing upon the First Amendment rights of others. *Ibid.* The Court of Appeals found the injunction to be content based and neither necessary to serve a compelling state interest nor narrowly drawn to achieve that end. *Ibid.,* citing *Carey* v. *Brown,* 447 U. S. 455, 461–462 (1980). We granted certiorari, 510 U. S. 1084 (1994), to resolve the conflict between the Florida Supreme Court and the Court of Appeals over the constitutionality of the state court's injunction.

## II

We begin by addressing petitioners' contention that the state court's order, because it is an injunction that restricts only the speech of antiabortion protesters, is necessarily content or viewpoint based. Accordingly, they argue, we should examine the entire injunction under the strictest standard of scrutiny. See *Perry Ed. Assn., supra,* at 45. We disagree. To accept petitioners' claim would be to classify virtually every injunction as content or viewpoint based. An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.

The fact that the injunction in the present case did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar demonstrations by those in favor of abortion, and of any consequent request that their demonstrations be regulated by injunction. There is no suggestion in this record that Florida law

would not equally restrain similar conduct directed at a target having nothing to do with abortion; none of the restrictions imposed by the court were directed at the contents of petitioner's message.

Our principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech "without reference to the content of the regulated speech." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989) (internal quotation marks omitted) (upholding noise regulations); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 386 (1992) ("The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed"); see also *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 230 (1987); *Regan* v. *Time, Inc.*, 468 U. S. 641, 648–649 (1984); *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 514–515 (1981) (plurality opinion); *Carey* v. *Brown, supra*, at 466–468. We thus look to the government's purpose as the threshold consideration. Here, the state court imposed restrictions on petitioners incidental to their antiabortion message because they repeatedly violated the court's original order. That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic. In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based. See *Boos* v. *Barry*, 485 U. S. 312 (1988).[2]  Accordingly, the injunction issued in

---

[2] We also decline to adopt the prior restraint analysis urged by petitioners. Prior restraints do often take the form of injunctions. See, *e. g.*, *New York Times Co.* v. *United States*, 403 U. S. 713 (1971) (refusing to enjoin publications of the "Pentagon Papers"); *Vance* v. *Universal Amusement Co.*, 445 U. S. 308 (1980) *(per curiam)* (holding that Texas public nuisance statute which authorized state judges, on the basis of a showing

this case does not demand the level of heightened scrutiny set forth in *Perry Ed. Assn.*, 460 U. S., at 45. And we proceed to discuss the standard which does govern.

### III

If this were a content-neutral, generally applicable statute, instead of an injunctive order, its constitutionality would be assessed under the standard set forth in *Ward* v. *Rock Against Racism, supra,* at 791, and similar cases. Given that the forum around the clinic is a traditional public forum, see *Frisby* v. *Schultz,* 487 U. S., at 480, we would determine whether the time, place, and manner regulations were "narrowly tailored to serve a significant governmental interest." *Ward, supra,* at 791. See also *Perry Ed. Assn., supra,* at 45.

There are obvious differences, however, between an injunction and a generally applicable ordinance. Ordinances represent a legislative choice regarding the promotion of particular societal interests. Injunctions, by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree. See *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632–633 (1953). Injunctions also carry greater risks of censorship and discriminatory application than do general ordinances. "[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Railway Express Agency, Inc.* v. *New York,* 336

---

that a theater had exhibited obscene films in the past, to enjoin its future exhibition of films not yet found to be obscene was unconstitutional as authorizing an invalid prior restraint). Not all injunctions that may incidentally affect expression, however, are "prior restraints" in the sense that that term was used in *New York Times Co., supra,* or *Vance, supra.* Here petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone. Moreover, the injunction was issued not because of the content of petitioners' expression, as was the case in *New York Times Co.* and *Vance,* but because of their prior unlawful conduct.

U. S. 106, 112–113 (1949). Injunctions, of course, have some advantages over generally applicable statutes in that they can be tailored by a trial judge to afford more precise relief than a statute where a violation of the law has already occurred. *United States* v. *Paradise*, 480 U. S. 149 (1987).

We believe that these differences require a somewhat more stringent application of general First Amendment principles in this context.[3] In past cases evaluating injunctions restricting speech, see, *e. g., NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886 (1982), *Milk Wagon Drivers* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287 (1941), we have relied upon such general principles while also seeking to ensure that the injunction was no broader than necessary to achieve its desired goals. See *Carroll* v. *President and Comm'rs of Princess Anne*, 393 U. S. 175 (1968); *Claiborne Hardware, supra*, at 912, n. 47. Our close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech is consistent with the general rule, quite apart from First Amendment considerations, "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). See also *Dayton Bd. of Ed.* v. *Brinkman*, 433 U. S. 406, 418–420 (1977). Accordingly, when evaluating a content-neutral injunction, we think that our standard time, place, and manner analysis is not sufficiently rigorous. We must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest. See, *e. g., Claiborne Hardware, supra*, at 916 (when sanctionable "conduct occurs in the context of constitutionally protected activity . . . 'precision of regulation' is

---

[3] Under general equity principles, an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a "cognizable danger of recurrent violation." *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953).

demanded") (quoting *NAACP* v. *Button,* 371 U. S. 415, 438 (1963)); 458 U. S., at 916, n. 52 (citing *Carroll, supra,* and *Keyishian* v. *Board of Regents of Univ. of State of N. Y.,* 385 U. S. 589, 604 (1967)); *Carroll, supra,* at 183–184.

Both JUSTICE STEVENS and JUSTICE SCALIA disagree with the standard we announce, for policy reasons. See *post,* at 778 (STEVENS, J.); *post,* at 792–794 (SCALIA, J.). JUSTICE STEVENS believes that "injunctive relief should be judged by a more lenient standard than legislation," because injunctions are imposed on individuals or groups who have engaged in illegal activity. *Post,* at 778. JUSTICE SCALIA, by contrast, believes that content-neutral injunctions are "*at least* as deserving of strict scrutiny as a statutory, content-based restriction." *Post,* at 792. JUSTICE SCALIA bases his belief on the danger that injunctions, even though they might not "attack content *as content,*" may be used to suppress particular ideas; that individual judges should not be trusted to impose injunctions in this context; and that an injunction is procedurally more difficult to challenge than a statute. *Post,* at 793–794. We believe that consideration of *all* of the differences and similarities between statutes and injunctions supports, as a matter of policy, the standard we apply here.

JUSTICE SCALIA further contends that precedent compels the application of strict scrutiny in this case. Under that standard, we ask whether a restriction is " 'necessary to serve a compelling state interest and [is] narrowly drawn to achieve that end.' " *Post,* at 790 (quoting *Perry Ed. Assn., supra,* at 45). JUSTICE SCALIA fails to cite a single case, and we are aware of none, in which we have applied this standard to a content-neutral injunction. He cites a number of cases in which we have struck down, with little or no elaboration, prior restraints on free expression. See *post,* at 798 (citing cases). As we have explained, however, we do not believe that this injunction constitutes a prior restraint, and we therefore believe that the "heavy presumption" against its constitutionality does not obtain here. See n. 2, *supra.*

JUSTICE SCALIA also relies on *Claiborne Hardware* and *Carroll* for support of his contention that our precedent requires the application of strict scrutiny in this context. In *Claiborne Hardware*, we stated simply that "precision of regulation" is demanded. 458 U. S., at 916 (internal quotation marks omitted). JUSTICE SCALIA reads this case to require "surgical precision" of regulation, *post*, at 798, but that was not the adjective chosen by the author of the Court's opinion, JUSTICE STEVENS. We think a standard requiring that an injunction "burden no more speech than necessary" exemplifies "precision of regulation."[4]

As for *Carroll*, JUSTICE SCALIA believes that the "standard" adopted in that case "is strict scrutiny," which "does not remotely resemble the Court's new proposal." *Post*, at 799. Comparison of the language used in *Carroll* and the wording of the standard we adopt, however, belies JUSTICE SCALIA's exaggerated contention. *Carroll*, for example, requires that an injunction be "couched in the narrowest terms that will accomplish the pin-pointed objective" of the injunction. 393 U. S., at 183. We require that the injunction "burden no more speech than necessary" to accomplish its objective. We fail to see a difference between the two standards.

The Florida Supreme Court concluded that numerous significant government interests are protected by the injunction. It noted that the State has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy. See

---

[4] In stating that "precision of regulation" is required in *Claiborne Hardware*, moreover, we cited both to *Carroll* v. *President and Comm'rs of Princess Anne*, 393 U. S. 175 (1968), a case involving an injunction, and to *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589 (1967), a case involving a state statute and regulations. If our precedent demanded the different treatment of statutes and injunctions, as JUSTICE SCALIA claims, it is difficult to explain our reliance on *Keyishian* in *Claiborne*.

*Roe* v. *Wade,* 410 U. S. 113 (1973); *In re T. W.,* 551 So. 2d 1186, 1193 (Fla. 1989). The State also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens. 626 So. 2d, at 672. In addition, the court believed that the State's strong interest in residential privacy, acknowledged in *Frisby* v. *Schultz,* 487 U. S. 474 (1988), applied by analogy to medical privacy. 626 So. 2d, at 672. The court observed that while targeted picketing of the home threatens the psychological well-being of the "captive" resident, targeted picketing of a hospital or clinic threatens not only the psychological, but also the physical, well-being of the patient held "captive" by medical circumstance. *Id.,* at 673. We agree with the Supreme Court of Florida that the combination of these governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them. We now examine each contested provision of the injunction to see if it burdens more speech than necessary to accomplish its goal.[5]

## A

### 1

We begin with the 36-foot buffer zone. The state court prohibited petitioners from "congregating, picketing, patrolling, demonstrating or entering" any portion of the public right-of-way or private property within 36 feet of the property line of the clinic as a way of ensuring access to the clinic. This speech-free buffer zone requires that petitioners move

---

[5] Petitioners do not challenge the first two provisions of the state court's 1993 order. Brief for Petitioners 9. The provisions composed what had been the state court's 1992 permanent injunction and they chiefly addressed blocking, impeding, and inhibiting access to the clinic and its parking lot. Nor do petitioners challenge the restrictions in paragraphs 7, 8, and 9, which prohibit them from harassing and physically abusing clinic doctors, staff, and patients trying to gain access to the clinic or their homes.

to the other side of Dixie Way and away from the driveway of the clinic, where the state court found that they repeatedly had interfered with the free access of patients and staff. App. to Pet. for Cert. B–2, B–3. See *Cameron* v. *Johnson*, 390 U. S. 611 (1968) (upholding statute that prohibited picketing that obstructed or unreasonably interfered with ingress or egress to or from public buildings, including courthouses, and with traffic on the adjacent street sidewalks). The buffer zone also applies to private property to the north and west of the clinic property. We examine each portion of the buffer zone separately.

We have noted a distinction between the type of focused picketing banned from the buffer zone and the type of generally disseminated communication that cannot be completely banned in public places, such as handbilling and solicitation. See *Frisby, supra,* at 486 ("The type of focused picketing prohibited by [the state court injunction] is fundamentally different from more generally directed means of communication that may not be completely banned in [public places]"). Here the picketing is directed primarily at patients and staff of the clinic.

The 36-foot buffer zone protecting the entrances to the clinic and the parking lot is a means of protecting unfettered ingress to and egress from the clinic, and ensuring that petitioners do not block traffic on Dixie Way. The state court seems to have had few other options to protect access given the narrow confines around the clinic. As the Florida Supreme Court noted, Dixie Way is only 21 feet wide in the area of the clinic. App. 260, 305. The state court was convinced that allowing petitioners to remain on the clinic's sidewalk and driveway was not a viable option in view of the failure of the first injunction to protect access. And allowing the petitioners to stand in the middle of Dixie Way would obviously block vehicular traffic.

The need for a complete buffer zone near the clinic entrances and driveway may be debatable, but some deference

must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review. *Milk Wagon Drivers,* 312 U. S., at 294. Moreover, one of petitioners' witnesses during the evidentiary hearing before the state court conceded that the buffer zone was narrow enough to place petitioners at a distance of no greater than 10 to 12 feet from cars approaching and leaving the clinic. App. 486. Protesters standing across the narrow street from the clinic can still be seen and heard from the clinic parking lots. *Id.,* at 260, 305. We also bear in mind the fact that the state court originally issued a much narrower injunction, providing no buffer zone, and that this order did not succeed in protecting access to the clinic. The failure of the first order to accomplish its purpose may be taken into consideration in evaluating the constitutionality of the broader order. *National Soc. of Professional Engineers* v. *United States,* 435 U. S. 679, 697–698 (1978). On balance, we hold that the 36-foot buffer zone around the clinic entrances and driveway burdens no more speech than necessary to accomplish the governmental interest at stake.

JUSTICE SCALIA's dissent argues that a videotape made of demonstrations at the clinic represents "what one must presume to be the worst of the activity justifying the injunction." *Post,* at 785–786. This seems to us a gratuitous assumption. The videotape was indeed introduced by respondents, presumably because they thought it supported their request for the second injunction. But witnesses also testified as to relevant facts in a 3-day evidentiary hearing, and the state court was therefore not limited to JUSTICE SCALIA's rendition of what he saw on the videotape to make its findings in support of the second injunction. Indeed, petitioners themselves studiously refrained from challenging the factual basis for the injunction both in the state courts and here. Before the Florida Supreme Court, petitioners stated that "the Amended Permanent Injunction contains fundamental error on its face. The sole question presented

by this appeal is a question of law, and for purposes of this appeal [petitioners] are assuming, arguendo, that a factual basis exists to grant injunctive relief." Appellants' Motion in Response to Appellees' Motion to Require Full Transcript and Record of Proceedings in No. 93–00969 (Dist. Ct. App. Fla.), p. 2. Petitioners argued against including the factual record as an appendix in the Florida Supreme Court, and never certified a full record. We must therefore judge this case on the assumption that the evidence and testimony presented to the state court supported its findings that the presence of protesters standing, marching, and demonstrating near the clinic's entrance interfered with ingress to and egress from the clinic despite the issuance of the earlier injunction.

2

The inclusion of private property on the back and side of the clinic in the 36-foot buffer zone raises different concerns. The accepted purpose of the buffer zone is to protect access to the clinic and to facilitate the orderly flow of traffic on Dixie Way. Patients and staff wishing to reach the clinic do not have to cross the private property abutting the clinic property on the north and west, and nothing in the record indicates that petitioners' activities on the private property have obstructed access to the clinic. Nor was evidence presented that protestors located on the private property blocked vehicular traffic on Dixie Way. Absent evidence that petitioners standing on the private property have obstructed access to the clinic, blocked vehicular traffic, or otherwise unlawfully interfered with the clinic's operation, this portion of the buffer zone fails to serve the significant government interests relied on by the Florida Supreme Court. We hold that on the record before us the 36-foot buffer zone as applied to the private property to the north and west of the clinic burdens more speech than necessary to protect access to the clinic.

## B

In response to high noise levels outside the clinic, the state court restrained the petitioners from "singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the [c]linic" during the hours of 7:30 a.m. through noon on Mondays through Saturdays. We must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary. We have upheld similar noise restrictions in the past, and as we noted in upholding a local noise ordinance around public schools, "the nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations . . . that are reasonable.'" *Grayned* v. *City of Rockford,* 408 U. S. 104, 116 (1972). Noise control is particularly important around hospitals and medical facilities during surgery and recovery periods, and in evaluating another injunction involving a medical facility, we stated:

> "'Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere.'" *NLRB* v. *Baptist Hospital, Inc.,* 442 U. S. 773, 783–784, n. 12 (1979), quoting *Beth Israel Hospital* v. *NLRB,* 437 U. S. 483, 509 (1978) (BLACKMUN, J., concurring in judgment).

We hold that the limited noise restrictions imposed by the state court order burden no more speech than necessary to ensure the health and well-being of the patients at the clinic. The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the

cacophony of political protests. "If overamplified loudspeakers assault the citizenry, government may turn them down." *Grayned, supra,* at 116. That is what the state court did here, and we hold that its action was proper.

## C

The same, however, cannot be said for the "images observable" provision of the state court's order. Clearly, threats to patients or their families, however communicated, are proscribable under the First Amendment. But rather than prohibiting the display of signs that could be interpreted as threats or veiled threats, the state court issued a blanket ban on all "images observable." This broad prohibition on all "images observable" burdens more speech than necessary to achieve the purpose of limiting threats to clinic patients or their families. Similarly, if the blanket ban on "images observable" was intended to reduce the level of anxiety and hypertension suffered by the patients inside the clinic, it would still fail. The only plausible reason a patient would be bothered by "images observable" inside the clinic would be if the patient found the expression contained in such images disagreeable. But it is much easier for the clinic to pull its curtains than for a patient to stop up her ears, and no more is required to avoid seeing placards through the windows of the clinic. This provision of the injunction violates the First Amendment.

## D

The state court ordered that petitioners refrain from physically approaching any person seeking services of the clinic "unless such person indicates a desire to communicate" in an area within 300 feet of the clinic. The state court was attempting to prevent clinic patients and staff from being "stalked" or "shadowed" by the petitioners as they approached the clinic. See *International Soc. for Krishna Consciousness, Inc.* v. *Lee,* 505 U. S. 672, 684 (1992) ("[F]ace-to-face solicitation presents risks of duress that are an appro-

priate target of regulation. The skillful, and unprincipled, solicitor can target the most vulnerable, including those accompanying children or those suffering physical impairment and who cannot easily avoid the solicitation").

But it is difficult, indeed, to justify a prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic. Absent evidence that the protesters' speech is independently proscribable (*i. e.*, "fighting words" or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, see *Milk Wagon Drivers*, 312 U. S., at 292–293, this provision cannot stand. "As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos* v. *Barry*, 485 U. S., at 322 (internal quotation marks omitted). The "consent" requirement alone invalidates this provision; it burdens more speech than is necessary to prevent intimidation and to ensure access to the clinic.[6]

### E

The final substantive regulation challenged by petitioners relates to a prohibition against picketing, demonstrating, or using sound amplification equipment within 300 feet of the residences of clinic staff. The prohibition also covers impeding access to streets that provide the sole access to streets on which those residences are located. The same analysis applies to the use of sound amplification equipment here as that discussed above: the government may simply demand that petitioners turn down the volume if the protests overwhelm the neighborhood. *Grayned*, 408 U. S., at 116.

---

[6] We need not decide whether the "images observable" and "no-approach" provisions are content based.

As for the picketing, our prior decision upholding a law banning targeted residential picketing remarked on the unique nature of the home, as "'the last citadel of the tired, the weary, and the sick.'" *Frisby*, 487 U. S., at 484. We stated that "'[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.'" *Ibid.*

But the 300-foot zone around the residences in this case is much larger than the zone provided for in the ordinance which we approved in *Frisby*. The ordinance at issue there made it "'unlawful for any person to engage in picketing before or about the residence or dwelling of any individual.'" *Id.*, at 477. The prohibition was limited to "focused picketing taking place solely in front of a particular residence." *Id.*, at 483. By contrast, the 300-foot zone would ban "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." *Ibid.* The record before us does not contain sufficient justification for this broad a ban on picketing; it appears that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result.

## IV

Petitioners also challenge the state court's order as being vague and overbroad. They object to the portion of the injunction making it applicable to those acting "in concert" with the named parties. But petitioners themselves are named parties in the order, and they therefore lack standing to challenge a portion of the order applying to persons who are not parties. Nor is that phrase subject, at the behest of petitioners, to a challenge for "overbreadth"; the phrase itself does not prohibit any conduct, but is simply directed at unnamed parties who might later be found to be acting "in concert" with the named parties. As such, the case is governed by our holding in *Regal Knitwear Co.* v. *NLRB*, 324 U. S. 9, 14 (1945). There a party subject to an injunction

argued that the order was invalid because of a provision that it applied to "successors and assigns" of the enjoined party. Noting that the party pressing the claim was not a successor or assign, we characterized the matter as "an abstract controversy over the use of these words." *Id.*, at 15.

Petitioners also contend that the "in concert" provision of the injunction impermissibly limits their freedom of association guaranteed by the First Amendment. See, *e. g., Citizens Against Rent Control/Coalition For Fair Housing* v. *Berkeley,* 454 U. S. 290 (1981). But petitioners are not enjoined from associating with others or from joining with them to express a particular viewpoint. The freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights.

## V

In sum, we uphold the noise restrictions and the 36-foot buffer zone around the clinic entrances and driveway because they burden no more speech than necessary to eliminate the unlawful conduct targeted by the state court's injunction. We strike down as unconstitutional the 36-foot buffer zone as applied to the private property to the north and west of the clinic, the "images observable" provision, the 300-foot no-approach zone around the clinic, and the 300-foot buffer zone around the residences, because these provisions sweep more broadly than necessary to accomplish the permissible goals of the injunction. Accordingly, the judgment of the Florida Supreme Court is

*Affirmed in part and reversed in part.*

JUSTICE SOUTER, concurring.

I join the Court's opinion and write separately only to clarify two matters in the record. First, the trial judge made reasonably clear that the issue of who was acting "in concert" with the named defendants was a matter to be taken up in

individual cases, and not to be decided on the basis of protesters' viewpoints. See Tr. 40, 43, 93, 115, 119–120 (Apr. 12, 1993, Hearing). Second, petitioners themselves acknowledge that the governmental interests in protection of public safety and order, of the free flow of traffic, and of property rights are reflected in Florida law. See Brief for Petitioners 17, and n. 7 (citing, e. g., Fla. Stat. §§ 870.041–870.047 (1991) (public peace); § 316.2045 (obstruction of public streets, highways, and roads)).

JUSTICE STEVENS, concurring in part and dissenting in part.

The certiorari petition presented three questions, corresponding to petitioners' three major challenges to the trial court's injunction.[1] The Court correctly and unequivocally rejects petitioners' argument that the injunction is a "content-based restriction on free speech," ante, at 762–764, as well as their challenge to the injunction on the basis that it applies to persons acting "in concert" with them, ante, at 775–776. I therefore join Parts II and IV of the Court's opinion, which properly dispose of the first and third questions presented. I part company with the Court, however, on its treatment of the second question presented, including its enunciation of the applicable standard of review.

---

[1] "QUESTIONS PRESENTED FOR REVIEW

"1. Whether a state court injunction placing a thirty-six-foot buffer zone around an abortion clinic which prohibits peaceful pro-life speech in a traditional public forum is an unconstitutional content-based restriction on free speech and association.

"2. Whether a state court injunction creating a consent requirement before speech is permitted within a three-hundred-foot buffer zone around an abortion clinic and residential areas is a reasonable time, place, and manner restriction or an unconstitutional prior restraint on free speech.

"3. Whether a state court injunction prohibiting named demonstrators and those acting 'in concert' from expressing peaceful speech within several designated buffer zones violates the First Amendment's protection of freedom of speech and association." Pet. for Cert. i.

## I

I agree with the Court that a different standard governs First Amendment challenges to generally applicable legislation than the standard that measures such challenges to judicial remedies for proven wrongdoing. See *ante*, at 764–765. Unlike the Court, however, I believe that injunctive relief should be judged by a more lenient standard than legislation. As the Court notes, legislation is imposed on an entire community, *ibid.*, regardless of individual culpability. By contrast, injunctions apply solely to an individual or a limited group of individuals who, by engaging in illegal conduct, have been judicially deprived of some liberty—the normal consequence of illegal activity.[2] Given this distinction, a statute prohibiting demonstrations within 36 feet of an abortion clinic would probably violate the First Amendment, but an injunction directed at a limited group of persons who have engaged in unlawful conduct in a similar zone might well be constitutional.

The standard governing injunctions has two obvious dimensions. On the one hand, the injunction should be no more burdensome than necessary to provide complete relief, *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). In a First Amendment context, as in any other, the propriety of the remedy depends almost entirely on the character of the violation and the likelihood of its recurrence. For this reason, standards fashioned to determine the constitutionality of statutes should not be used to evaluate injunctions.

On the other hand, even when an injunction impinges on constitutional rights, more than "a simple proscription

---

[2] Contrary to JUSTICE SCALIA's assumption, see *post*, at 794, n. 1, the deprivation of liberty caused by an injunction is not a form of punishment. Moreover, there is nothing unusual about injunctive relief that includes some restriction on speech as a remedy for prior misconduct. *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 697–698 (1978).

against the precise conduct previously pursued" may be required; the remedy must include appropriate restraints on "future activities both to avoid a recurrence of the violation and to eliminate its consequences." *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 697–698 (1978). Moreover, "[t]he judicial remedy for a proven violation of law will often include commands that the law does not impose on the community at large." *Teachers* v. *Hudson*, 475 U. S. 292, 309–310, n. 22 (1986). As such, repeated violations may justify sanctions that might be invalid if applied to a first offender or if enacted by the legislature. See *United States* v. *Paradise*, 480 U. S. 149 (1987).

In this case, the trial judge heard three days of testimony and found that petitioners not only had engaged in tortious conduct, but also had repeatedly violated an earlier injunction. The injunction is thus twice removed from a legislative proscription applicable to the general public and should be judged by a standard that gives appropriate deference to the judge's unique familiarity with the facts.

## II

The second question presented by the certiorari petition asks whether the "consent requirement before speech is permitted" within a 300-foot buffer zone around the clinic unconstitutionally infringes on free speech.[3] Petitioners contend that these restrictions create a "no speech" zone in which they cannot speak unless the listener indicates a positive

---

[3] See n. 1, *supra*. This question also encompasses the separate but related question whether the 300-foot buffer zone in residential areas is a reasonable time, place, and manner restriction, but incorrectly refers to that zone as containing a consent requirement. For the reasons stated in Part III–E of the Court's opinion, which I join, I agree that the findings do not justify such a broad ban on picketing. I also agree with the Court's rejection of petitioners' prior restraint challenge to the 300-foot zones. See *ante*, at 763, n. 2.

interest in their speech. And, in Part III–D of its opinion, the Court seems to suggest that, even in a more narrowly defined zone, such a consent requirement is constitutionally impermissible. *Ante,* at 773–774. Petitioners' argument and the Court's conclusion, however, are based on a misreading of ¶ (5) of the injunction.[4]

That paragraph does not purport to prohibit speech; it prohibits a species of conduct. Specifically, it prohibits petitioners "from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring" of petitioners. App. 59. The meaning of the term "physically approaching" is explained by the detailed prohibition that applies when the patient refuses to converse with, or accept delivery of literature from, petitioners. Absent such consent, the petitioners "shall not accompany such person, encircle, surround, harass, threaten or physically or verbally abuse those individuals who choose not to communicate with them." *Ibid.* As long as petitioners do not physically approach patients in this manner, they remain free not only to communicate with the public but also to offer verbal or written advice on an individual basis to the clinic's patients through their "sidewalk counseling."

---

[4] The full text of ¶ (5) reads as follows:

"At all times on all days, in an area within three-hundred (300) feet of the Clinic, from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring of the [petitioners]. In the event of such invitation, the [petitioners] may engage in communications consisting of conversation of a non-threatening nature and by the delivery of literature within the three-hundred (300) foot area but in no event within the 36 foot buffer zone. Should any individual decline such communication, otherwise known as 'sidewalk counseling', that person shall have the absolute right to leave or walk away and the [petitioners] shall not accompany such person, encircle, surround, harass, threaten or physically or verbally abuse those individuals who choose not to communicate with them." App. 59.

Petitioners' "counseling" of the clinic's patients is a form of expression analogous to labor picketing. It is a mixture of conduct and communication. "In the labor context, it is the conduct element rather than the particular idea being expressed that often provides the most persuasive deterrent to third persons about to enter a business establishment." *NLRB* v. *Retail Store Employees*, 447 U. S. 607, 619 (1980) (STEVENS, J., concurring in part and concurring in result). As with picketing, the principal reason why handbills containing the same message are so much less effective than "counseling" is that "the former depend entirely on the persuasive force of the idea." *Ibid.* Just as it protects picketing, the First Amendment protects the speaker's right to offer "sidewalk counseling" to all passers-by. That protection, however, does not encompass attempts to abuse an unreceptive or captive audience, at least under the circumstances of this case. One may register a public protest by placing a vulgar message on his jacket and, in so doing, expose unwilling viewers, *Cohen* v. *California*, 403 U. S. 15, 21–22 (1971). Nevertheless, that does not mean that he has an unqualified constitutional right to follow and harass an unwilling listener, especially one on her way to receive medical services. Cf. *Grayned* v. *City of Rockford*, 408 U. S. 104, 116 (1972).

The "physically approaching" prohibition entered by the trial court is no broader than the protection necessary to provide relief for the violations it found. The trial judge entered this portion of the injunction only after concluding that the injunction was necessary to protect the clinic's patients and staff from "uninvited contacts, shadowing and stalking" by petitioners. App. 56. The protection is especially appropriate for the clinic patients given that the trial judge found that petitioners' prior conduct caused higher levels of "anxiety and hypertension" in the patients, increasing the risks associated with the procedures that the patients

seek.[5]  Whatever the proper limits on a court's power to restrict a speaker's ability to physically approach or follow an unwilling listener, surely the First Amendment does not prevent a trial court from imposing such a restriction given the unchallenged findings in this case.

The Florida Supreme Court correctly concluded:

> "While the First Amendment confers on each citizen a powerful right to express oneself, it gives the picketer no boon to jeopardize the health, safety, and rights of others.  No citizen has a right to insert a foot in the hospital or clinic door and insist on being heard—while purposefully blocking the door to those in genuine need of medical services.  No picketer can force speech into the captive ear of the unwilling and disabled." *Operation Rescue* v. *Women's Health Center, Inc.,* 626 So. 2d 664, 675 (1993).

I thus conclude that, under the circumstances of this case, the prohibition against "physically approaching" in the 300-foot zone around the clinic withstands petitioners' First Amendment challenge.  I therefore dissent from Part III–D.

## III

Because I have joined Parts I, II, III–E, and IV of the Court's opinion and have dissented as to Part III–D after concluding that the 300-foot zone around the clinic is a reasonable time, place, and manner restriction, no further discussion is necessary.  See n. 1, *supra.*  The Court, however, proceeds to address challenges to the injunction that, al-

---

[5] Specifically, in its findings of fact, the trial court noted that:

"This physician also testified that he witnessed the demonstrators running along side of and in front of patients' vehicles, pushing pamphlets in car windows to persons who had not indicated any interest in such literature. As a result of patients having to run such a gauntlet, the patients manifested a higher level of anxiety and hypertension causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures." *Id.,* at 54.

though arguably raised by petitioners' briefs, are not properly before the Court.

After correctly rejecting the content-based challenge to the 36-foot buffer zone raised by the first question in the certiorari petition, the Court nevertheless decides to modify the portion of that zone that it believes does not protect ingress to the clinic. Petitioners, however, presented only a content-based challenge to the 36-foot zone; they did not present a time, place, and manner challenge. See n. 1, *supra.* They challenged only the 300-foot zones on this ground. *Ibid.* The scope of the 36-foot zone is thus not properly before us.[6] *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U. S. Phillips Corp.,* 510 U. S. 27 (1993) *(per curiam).*[7]

---

[6] Indeed, it is unclear whether these challenges were presented to the Florida Supreme Court. In their appeal to that court, petitioners did not even file the transcript of the evidentiary hearings, contending that the "sole question presented by this appeal is a question of law." See Appellants' Motion in Response to Appellees' Motion to Require Full Transcript and Record of Proceedings in No. 93–00969 (Dist. Ct. App. Fla.), p. 2. Because petitioners argued that the entire decree was invalid as a matter of law, without making any contention that particular provisions should be modified, it appears there was no argument in that court about the size or the shape of the buffer zones.

Even if the question were properly presented here, I fully agree with the Florida Supreme Court's refusal to quibble over a few feet one way or the other when the parties have not directed their arguments at a narrow factual issue of this kind. *Operation Rescue* v. *Women's Health Center, Inc.,* 626 So. 2d 664, 673 (1993). Moreover, respect for the highest court of the State strongly counsels against this sort of error correction in this Court.

[7] Even assuming that a time, place, and manner challenge to the 36-foot zone is fairly included within the first question presented, petitioners' brief challenges the *entire* 36-foot zone as overbroad and seeks to have it invalidated in its entirety. Nowhere in their briefs do they argue that the portion of the zone on the north and west sides of the clinic should be struck down in the event the Court upholds the restrictions on the front and east. As such, we do not have the benefit of respondents' arguments why those portions, if considered severally from the other portions of the zone, should be upheld. Moreover, the existence in the record of facts found by the

The same is true of the noise restrictions and the "images observable" provision of ¶ (4).[8] That paragraph does not refer to the 36-foot or the 300-foot buffer zones, nor does it relate to the constitutionality of the "in concert" provision. As such, although I am inclined to agree with the Court's resolution respecting the noise and images restrictions, I believe the Court should refrain from deciding their constitutionality because they are not challenged by the questions on which certiorari was granted.

## IV

For the reasons stated, I concur in Parts I, II, III–E, and IV of the Court's opinion, and respectfully dissent from the remaining portions.

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in the judgment in part and dissenting in part.

The judgment in today's case has an appearance of moderation and Solomonic wisdom, upholding as it does some

---

trial court respecting petitioners' conduct—independent of petitioners' obstruction of ingress and egress—that support the entire 36-foot zone makes the Court's micromanagement of the injunction particularly inappropriate. See, e. g., App. 53 ("The clinic has fences on its west and north side, and persons would occasionally place a ladder on the outside of the fence and position themselves at an elevation above the fence and attempt to communicate by shouting at persons (staff and patients) entering the clinic"); id., at 54 ("[T]he doctor was followed as he left the clinic by a person associated with the [petitioners] who communicated his anger to the doctor by pretending to shoot him from the adjoining vehicle"); id., at 54–55 (noting that "a physician similarly employed was killed by an antiabortionist at a clinic in North Florida").

[8] Paragraph (4) provides in full:

"During the hours of 7:30 a.m. through noon, on Mondays through Saturdays, during surgical procedures and recovery periods, from singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the Clinic." Id., at 59.

portions of the injunction while disallowing others. That appearance is deceptive. The entire injunction in this case departs so far from the established course of our jurisprudence that in any other context it would have been regarded as a candidate for summary reversal.

But the context here is abortion. A long time ago, in dissent from another abortion-related case, JUSTICE O'CONNOR, joined by then-JUSTICE REHNQUIST, wrote:

> "This Court's abortion decisions have already worked a major distortion in the Court's constitutional jurisprudence. Today's decision goes further, and makes it painfully clear that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion. The permissible scope of abortion regulation is not the only constitutional issue on which this Court is divided, but—except when it comes to abortion—the Court has generally refused to let such disagreements, however longstanding or deeply felt, prevent it from evenhandedly applying uncontroversial legal doctrines to cases that come before it." *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 814 (1986) (citations omitted).

Today the ad hoc nullification machine claims its latest, greatest, and most surprising victim: the First Amendment.

Because I believe that the judicial creation of a 36-foot zone in which only a particular group, which had broken no law, cannot exercise its rights of speech, assembly, and association, and the judicial enactment of a noise prohibition, applicable to that group and that group alone, are profoundly at odds with our First Amendment precedents and traditions, I dissent.

I

The record of this case contains a videotape, with running caption of time and date, displaying what one must presume

to be the worst of the activity justifying the injunction issued by Judge McGregor and partially approved today by this Court. The tape was shot by employees of, or volunteers at, the Aware Woman Clinic on three Saturdays in February and March 1993; the camera location, for the first and third segments, appears to have been an upper floor of the clinic. The tape was edited down (from approximately 6 to 8 hours of footage to ½ hour) by Ruth Arick, a management consultant employed by the clinic and by the Feminist Majority Foundation. App. 527, 529, 533.

Anyone seriously interested in what this case was about must view that tape. And anyone doing so who is familiar with run-of-the-mine labor picketing, not to mention some other social protests, will be aghast at what it shows we have today permitted an individual judge to do. I will do my best to describe it.

On Saturday, March 6, 1993, a group of antiabortion protesters is gathered in front of the clinic, arrayed from east (camera-left) to west (camera-right) on the clinic side of Dixie Way, a small, nonartery street. Men, women, and children are also visible across the street, on the south side of Dixie Way; some hold signs and appear to be protesters, others may be just interested onlookers.

On the clinic side of the street, two groups confront each other across the line marking the south border of the clinic property—although they are so close together it is often impossible to tell them apart. On the clinic property (and with their backs to the camera) are a line of clinic and abortion-rights supporters, stretching the length of the property. Opposite them, and on the public right-of-way between the clinic property and Dixie Way itself, is a group of abortion opponents, some standing in place, others walking a picket line in an elongated oval pattern running the length of the property's south border. Melbourne police officers are visible at various times walking about in front of the

clinic, and individuals can be seen crossing Dixie Way at various times.

Clinic supporters are more or less steadily chanting the following slogans: "Our right, our right, our right, to decide"; "Right to life is a lie, you don't care if women die." Then abortion opponents can be heard to sing: "Jesus loves the little children, all the children of the world, red and yellow, black and white, they are precious in His sight, Jesus loves the little children of the world." Clinic supporters respond with: Q: "What do we want?" A: "Choice." Q: "When do we want it?" A: "Now." ("Louder!") And that call and response is repeated. Later in the tape, clinic supporters chant "1–2–3–4, we won't take it anymore; 5–6–7–8, Separate the Church and State." On placards held by picketers and by stationary protesters on both sides of the line, the following slogans are visible: "Abortionists lie to women." "Choose Life: Abortion Kills." "N.O.W. Violence." "The God of Israel is Pro-life." "RU 486 Now." "She Is a Child, Not a Choice." "Abortion Kills Children." "Keep Abortion Legal." "Abortion: God Calls It Murder." Some abortion opponents wear T-shirts bearing the phrase "Choose Life."

As the abortion opponents walk the picket line, they traverse portions of the public right-of-way that are crossed by paved driveways, on each side of the clinic, connecting the clinic's parking lot to the street. At one point an automobile moves west on Dixie Way and slows to turn into the westernmost driveway. There is a 3-to-4-second delay as the picketers, and then the clinic supporters, part to allow the car to enter. The camera cuts to a shot of another, parked car with a potato jammed onto the tailpipe. There is no footage of any person putting the potato on to the tailpipe.

Later, at a point when the crowd appears to be larger and the picketers more numerous, a red car is delayed approximately 10 seconds as the picketers (and clinic supporters) move out of the driveway. Police are visible helping to clear

a path for the vehicle to enter. As the car waits, two persons appearing to bear leaflets approach, respectively, the driver and front passenger doors. They appear to elicit no response from the car's occupants and the car passes safely onto clinic property. Later, a blue minivan enters the driveway and is also subject to the same delay. Still later a jeep-type vehicle leaves the clinic property and slows down slightly where the driveway crosses the public right-of-way. At no time is there any apparent effort to prevent entry or exit, or even to delay it, except for the time needed for the picketers to get out of the way. There is no sitting down, packing en masse, linking of hands, or any other effort to blockade the clinic property.

The persons standing but not walking the picket line include a woman with a child in a stroller and a man shouting the Book of Daniel's account of Meshach, Shadrach, and Abednego. A woman on a stepladder holds up a sign in the direction of the clinic; a clinic supporter counters with a larger sign held up between the other and the clinic. A brief shot reveals an older man in a baseball cap—head, shoulders, and chest visible above the clinic fence—who appears to be reading silently from a small book. A man on clinic property holds a boom box out in the direction of the abortion opponents. As the crowd grows it appears at various points to have spilled over into the north-side, westbound lane of Dixie Way.

At one point, Randall Terry arrives and the press converge upon him, apparently in Dixie Way itself. A sign is held near his head reading "Randall Terry Sucks." Terry appears to be speaking to the press and at one point tears pages from a notebook of some kind. Through all of this, abortion opponents and abortion-rights supporters appear to be inches from one another on each side of the south border of the property. They exchange words, but at no time is there any violence or even any discernible jostling or physical contact between these political opponents.

The scene shifts to early afternoon of the same day. Most of the press and most of the abortion opponents appear to have departed. The camera focuses on a woman who faces the clinic and, hands cupped over her mouth, shouts the following: "Be not deceived; God is not mocked. . . . Ed Windle, God's judgment is on you, and if you don't repent, He will strike you dead. The baby's blood flowed over your hands, Ed Windle. . . . You will burn in hell, Ed Windle, if you don't repent. There were arms and legs pulled off today. . . . An innocent little child, a little boy, a little girl, is being destroyed right now." Cheering is audible from the clinic grounds. A second person shouts "You are responsible for the deaths of children. . . . You are a murderer. Shame on you." From the clinic grounds someone shouts "Why don't you go join the wacko in Waco?" The first woman says "You are applauding the death of your children. We will be everywhere. . . . There will be no peace and no rest for the wicked. . . . I pray that you will give them dreams and nightmares, God."

The second segment of the videotape displays a group of approximately 40 to 50 persons walking along the side of a major highway. It is Saturday, March 13, 1993, at 9:56 a.m. The demonstrators walk in an oval pattern, carrying no signs or other visible indicators of their purpose. According to Ruth Arick, this second portion was filmed in front of the condominium where clinic owner Ed Windle lived.

A third segment begins. The date-time register indicates that it is the morning of Saturday, February 20, 1993. A teenage girl faces the clinic and exclaims: "Please don't let them kill me, Mommy. Help me, Daddy, please." Clinic supporters chant, "We won't go back." A second woman, the one who spoke at greatest length in the first segment, calls, "If you [inaudible], help her through it." Off camera, a group sings "Roe, Roe, Roe v. Wade, we will never quit, Freedom of choice is the law of the land, better get used to it." The woman from the first segment appears to address

specific persons on clinic property: "Do you ever wonder what your baby would have looked like? Do you wonder how old it would have been? Because I did the same thing . . . ." Then a police officer is visible writing someone a citation. The videotape ends with a shot of an automobile moving eastbound on Dixie Way. As it slows to a stop at the intersection of U. S. 1, two leafletters approach the car and then pull back as it passes on.

The videotape and the rest of the record, including the trial court's findings, show that a great many forms of expression and conduct occurred in the vicinity of the clinic. These include singing, chanting, praying, shouting, the playing of music both from the clinic and from handheld boom boxes, speeches, peaceful picketing, communication of familiar political messages, handbilling, persuasive speech directed at opposing groups on the issue of abortion, efforts to persuade individuals not to have abortions, personal testimony, interviews with the press, and media efforts to report on the protest. What the videotape, the rest of the record, and the trial court's findings do not contain is any suggestion of violence near the clinic, nor do they establish any attempt to prevent entry or exit.

## II

### A

Under this Court's jurisprudence, there is no question that this public sidewalk area is a "public forum," where citizens generally have a First Amendment right to speak. *United States* v. *Grace*, 461 U. S. 171, 177 (1983). The parties to this case invited the Court to employ one or the other of the two well-established standards applied to restrictions upon this First Amendment right. Petitioners claimed the benefit of so-called "strict scrutiny," the standard applied to content-based restrictions: The restriction must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Perry Ed. Assn.* v. *Perry Local Educa-*

*tors' Assn.*, 460 U. S. 37, 45 (1983). Respondents, on the other hand, contended for what has come to be known as "intermediate scrutiny" (midway between the "strict scrutiny" demanded for content-based regulation of speech and the "rational basis" standard that is applied—under the Equal Protection Clause—to government regulation of non-speech activities). See, *e. g.*, *Turner Broadcasting System, Inc.* v. *FCC, ante*, at 642. That standard, applicable to so-called "time, place, and manner regulations" of speech, provides that the regulations are permissible so long as they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry, supra*, at 45. The Court adopts neither of these, but creates, brand new for this abortion-related case, an additional standard that is (supposedly) "somewhat more stringent," *ante*, at 765, than intermediate scrutiny, yet not as "rigorous," *ibid.*, as strict scrutiny. The Court does not give this new standard a name, but perhaps we could call it intermediate-intermediate scrutiny. The difference between it and intermediate scrutiny (which the Court acknowledges is inappropriate for injunctive restrictions on speech) is frankly too subtle for me to describe, so I must simply recite it: Whereas intermediate scrutiny requires that the restriction be "narrowly tailored to serve a significant government interest," the new standard requires that the restriction "burden no more speech than necessary to serve a significant government interest." *Ibid.*

I shall discuss the Court's mode of applying this supposedly new standard presently, but first I must remark upon the peculiar manner in which the standard was devised. The Court begins, in Part II of the opinion, by considering petitioners' contention that, since the restriction is content based, strict scrutiny should govern. It rejects the premise, and hence rejects the conclusion. It then proceeds, in Part III, to examination of respondents' contention that plain old

intermediate scrutiny should apply. It says no to that, too, because of the distinctive characteristics of injunctions that it discusses, *ante*, at 764–765, and hence decides to supplement intermediate scrutiny with intermediate-intermediate scrutiny. But this neatly staged progression overlooks an obvious option. The real question in this case is not whether intermediate scrutiny, which the Court assumes to be some kind of default standard, should be supplemented because of the distinctive characteristics of injunctions; but rather whether those distinctive characteristics are not, for reasons of both policy and precedent, fully as good a reason as "content basis" for demanding strict scrutiny. That possibility is simply not considered. Instead, the Court begins Part III with the following optical illusion: "If this were a content-neutral, generally applicable statute, instead of an injunctive order, its constitutionality would be assessed under the [intermediate scrutiny] standard," *ante*, at 764— and then proceeds to discuss whether petitioners can sustain the burden of departing from that presumed disposition.

But this is *not* a statute, and it *is* an injunctive order. The Court might just as logically (or illogically) have begun Part III: "If this were a content-based injunction, rather than a non-content-based injunction, its constitutionality would be assessed under the strict scrutiny standard"—and have then proceeded to discuss whether *respondents* can sustain the burden of departing from *that* presumed disposition. The question should be approached, it seems to me, without any such artificial loading of the dice. And the central element of the answer is that a restriction upon speech imposed by injunction (whether nominally content based or nominally content neutral) is *at least* as deserving of strict scrutiny as a statutory, content-based restriction.

That is so for several reasons: The danger of content-based statutory restrictions upon speech is that they may be designed and used precisely to suppress the ideas in question rather than to achieve any other proper governmental aim.

But that same danger exists with injunctions. Although a speech-restricting injunction may not attack content *as content* (in the present case, as I shall discuss, even that is not true), it lends itself just as readily to the targeted suppression of particular ideas. When a judge, on the motion of an employer, enjoins picketing at the site of a labor dispute, he enjoins (and he *knows* he is enjoining) the expression of pro-union views. Such targeting of one or the other side of an ideological dispute cannot readily be achieved in speech-restricting general legislation except by making content the basis of the restriction; it is achieved in speech-restricting injunctions almost invariably. The proceedings before us here illustrate well enough what I mean. The injunction was sought against a single-issue advocacy group by persons and organizations with a business or social interest in suppressing that group's point of view.

The second reason speech-restricting injunctions are at least as deserving of strict scrutiny is obvious enough: They are the product of individual judges rather than of legislatures—and often of judges who have been chagrined by prior disobedience of their orders. The right to free speech should not lightly be placed within the control of a single man or woman. And the third reason is that the injunction is a much more powerful weapon than a statute, and so should be subjected to greater safeguards. Normally, when injunctions are enforced through contempt proceedings, only the defense of factual innocence is available. The collateral bar rule of *Walker* v. *Birmingham*, 388 U. S. 307 (1967), eliminates the defense that the injunction itself was unconstitutional. Accord, *Dade County Classroom Teachers' Assn.* v. *Rubin*, 238 So. 2d 284, 288 (Fla. 1970). Thus, persons subject to a speech-restricting injunction who have not the money or not the time to lodge an immediate appeal face a Hobson's choice: They must remain silent, since if they speak their First Amendment rights are no defense in subsequent

contempt proceedings. This is good reason to require the strictest standard for issuance of such orders.[1]

The Court seeks to minimize the similarity between speech-restricting injunctions and content-based statutory proscriptions by observing that the fact that "petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order," but rather "suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions," *ante,* at 763. But the Court errs in thinking that the vice of content-based statutes is that they necessarily have the invidious purpose of suppressing particular ideas. "[O]ur cases have consistently held that '[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment.'" *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 117 (1991) (quoting *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575, 592 (1983)). The vice of content-based legislation—what renders it *deserving* of the high standard of strict scrutiny—is not that it is *always* used for invidious, thought-control purposes, but that it *lends itself* to use for those purposes. And, because of the unavoid-

---

[1] JUSTICE STEVENS believes that speech-restricting injunctions "should be judged by a more lenient standard than legislation" because "injunctions apply solely to [those] who, by engaging in illegal conduct, have been judicially deprived of some liberty." *Ante,* at 778. Punishing unlawful action by judicial abridgment of First Amendment rights is an interesting concept; perhaps Eighth Amendment rights could be next. I know of no authority for the proposition that restriction of speech, rather than fines or imprisonment, should be the sanction for misconduct. The supposed prior violation of a judicial order was the only thing that rendered petitioners *subject* to a personally tailored restriction on speech in the first place—not in order to punish them, but to protect the public order. To say that their prior violation not only subjects them to being singled out in this fashion, but also loosens the standards for protecting the public order through speech restrictions, is double counting.

able "targeting" discussed above, precisely the same is true of the speech-restricting injunction.

Finally, though I believe speech-restricting injunctions are dangerous enough to warrant strict scrutiny even when they are not technically content based, I think the injunction in the present case was content based (indeed, viewpoint based) to boot. The Court claims that it was directed, not at those who *spoke* certain things (antiabortion sentiments), but at those who *did* certain things (violated the earlier injunction). If that were true, then the injunction's residual coverage of "all persons acting in concert or participation with [the named individuals and organizations], or on their behalf," would not include those who merely entertained the same beliefs and wished to express the same views as the named defendants. But the construction given to the injunction by the issuing judge, which is entitled to great weight, cf. *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123, 132–133 (1992); *NLRB* v. *Donnelly Garment Co.,* 330 U. S. 219, 227 (1947), is to the contrary: All those who wish to express the same views as the named defendants are deemed to be "acting in concert or participation." Following issuance of the amended injunction, a number of persons were arrested for walking within the 36-foot speech-free zone. At an April 12, 1993, hearing before the trial judge who issued the injunction, the following exchanges occurred:

Mr. Lacy: "I was wondering how we can—why we were arrested and confined as being in concert with these people that we don't know, when other people weren't, that were in that same buffer zone, and it was kind of selective as to who was picked and who was arrested and who was obtained for the same buffer zone in the same public injunction."

The Court: "Mr. Lacy, I understand that those on the other side of the issue [abortion-rights supporters] were also in the area. If you are referring to them, the Injunction did not pertain to those on the other side of the

issue, because *the word in concert with means in concert with those who had taken a certain position in respect to the clinic, adverse to the clinic. If you are saying that is the selective basis that the pro-choice were not arrested when pro-life was arrested, that's the basis of that selection. . . .*" Tr. 104–105 (Appearance Hearings Held Before Judge McGregor, Eighteenth Judicial Circuit, Seminole County, Florida (emphasis added)).

And:

John Doe No. 16: "This was the first time that I was in this area myself and I had not attempted to block an entrance to a clinic in that town or anywhere else in the State of Florida in the last year or ever.

"I also understand that the reason why I was arrested was because I acted in concert with those who were demonstrating pro-life. I guess the question that I'm asking is were the beliefs in ideologies of the people that were present, were those taken into consideration when we were arrested?

". . . *When you issued the Injunction did you determine that it would only apply to—that it would apply only to people that were demonstrating that were pro-life?*"

The Court: *"In effect, yes."* Id., at 113–116 (emphasis added).

And finally:

John Doe No. 31: ". . . How did the police determine that I was acting in concert with some organization that was named on this injunction? I again am a person who haven't seen this injunction. So how did the police determine that I was acting in concert?"

The Court: "They observed your activities and determined in their minds *whether or not what you were*

*doing was in concert with the—I gather the pro-life position* of the other, of the named Defendants." *Id.,* at 148 (emphasis added).

These colloquies leave no doubt that the revised injunction here is tailored to restrain persons distinguished, not by proscribable *conduct,* but by proscribable *views.*[2]

## B

I have discussed, in the prior subsection, the policy reasons for giving speech-restricting injunctions, even content-neutral ones, strict scrutiny. There are reasons of precedent as well, which are essentially ignored by the Court.

To begin with, an injunction against speech is the very prototype of the greatest threat to First Amendment values, the prior restraint. As THE CHIEF JUSTICE wrote for the Court last Term: "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' . . . [P]ermanent injunctions, *i. e.,*—court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander* v. *United States,* 509 U. S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984) (emphasis added in *Alexander*)).[3] See also 509 U. S., at 572 ("[T]he

---

[2] JUSTICE SOUTER seeks to contradict this, saying that "the trial judge made reasonably clear that the issue of who was acting 'in concert' with the named defendants was . . . not to be decided on the basis of protesters' viewpoints. See Tr. 40, 43, 93, 115, 119–120 (Apr. 12, 1993, Hearing)." *Ante,* at 776–777. The only way to respond to this scattershot assertion is to refer the reader to the cited pages, plus one more (page 116) which clarifies what might have been ambiguous on page 115. These pages are reproduced verbatim in the Appendix to this opinion. As the reader will observe, they do not remotely support JUSTICE SOUTER's assertion that the injunction does not distinguish on the basis of viewpoint.

[3] This statement should be compared with today's opinion, which says, *ante,* at 763, n. 2, that injunctions are not prior restraints (or at least not the nasty kind) if they only restrain speech in a certain area, or if the

[prior restraint] doctrine . . . encompasses injunctive systems which threaten or bar future speech based on some past infraction") (KENNEDY, J., dissenting). We have said that a "prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity," *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971) (quoting *Carroll* v. *President and Comm'rs of Princess Anne,* 393 U. S. 175, 181 (1968)), and have repeatedly struck down speech-restricting injunctions. See, *e. g., Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131 (1957); *Keefe, supra; New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976); *National Socialist Party of America* v. *Skokie,* 432 U. S. 43 (1977); *Vance* v. *Universal Amusement Co.,* 445 U. S. 308 (1980) (statute authorizing injunctions); *CBS Inc.* v. *Davis,* 510 U. S. 1315 (1994) (BLACKMUN, J., in chambers) (setting aside state-court preliminary injunction against a scheduled broadcast).

At oral argument neither respondents nor the Solicitor General, appearing as *amicus* for respondents, could identify a single speech-injunction case applying mere intermediate scrutiny (which differs little if at all from the Court's intermediate-intermediate scrutiny). We have, in our speech-injunction cases, affirmed both requirements that characterize strict scrutiny: compelling public need and surgical precision of restraint. Even when (unlike in the present case) the First Amendment activity is intermixed with *violent* conduct, " 'precision of regulation' is demanded." *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 916 (1982) (quoting *NAACP* v. *Button,* 371 U. S. 415, 438 (1963)). In *Milk Wagon Drivers* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287 (1941), we upheld an injunction prohibiting peaceful picketing, but only because the picketing had been accompanied by 50 instances of window smashing, bombings, stench

---

basis for their issuance is not content but prior unlawful conduct. This distinction has no antecedent in our cases.

bombings, destruction of trucks, beatings of drivers, arson, and armed violence. We noted that the "picketing . . . was set in a background of violence," *id.*, at 294, which was "neither episodic nor isolated," *id.*, at 295, and we allowed the ban on picketing "to prevent future coercion," *id.*, at 296, as part of a state court's power "to deal with coercion due to extensive violence," *id.*, at 299. We expressly distinguished the case from those in which there was no "[e]ntanglement with violence." *Id.*, at 297. In *Youngdahl* v. *Rainfair, Inc.*, *supra*, we refused to allow a blanket ban on picketing when, even though there had been scattered violence, it could not be shown that "a pattern of violence was established which would inevitably reappear in the event picketing were later resumed." *Id.*, at 139.

The utter lack of support for the Court's test in our jurisprudence is demonstrated by the two cases the opinion relies upon. For the proposition that a speech restriction is valid when it "burden[s] no more speech than necessary to accomplish a significant government interest," the Court cites *NAACP* v. *Claiborne Hardware Co.*, *supra*, and *Carroll* v. *President and Comm'rs of Princess Anne*, *supra*, at 184. But as I shall demonstrate in some detail below, *Claiborne* applied a much more stringent test; and the very text of *Carroll* contradicts the Court. In the passage cited, *Carroll* says this: "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." 393 U. S., at 183. That, of course, is strict scrutiny; and it does not remotely resemble the Court's new proposal, for which it is cited as precedential support. "Significant government interest[s]" (referred to in the Court's test) are general, innumerable, and omnipresent—at least one of them will be implicated by any activity set in a public forum. "Essential needs of the public order," on the other hand, are factors of *exceptional* application. And that an injunction

"burden no more than necessary" is not nearly as demanding as the requirement that it be couched in the "narrowest terms that will accomplish [a] pin-pointed objective." That the Court should cite this case as its principal authority is an admission that what it announces rests upon no precedent at all.

## III

### A

I turn now from the Court's selection of a constitutional test to its actual application of that test to the facts of the present case. Before doing that, however, it will be helpful—in order to demonstrate how far the Court has departed from past practice—to consider how we proceeded in a relatively recent case that did not involve the disfavored class of abortion protesters. *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886 (1982), involved, like this case, protest demonstrations against private citizens mingling political speech with (what I will assume for the time being existed here) significant illegal behavior.[4]

Writing for the Court, JUSTICE STEVENS summarized the events giving rise to the *Claiborne* litigation (*id.*, at 898–906): A local chapter of the NAACP, rebuffed by public officials of Port Gibson and Claiborne County in its request for redress of various forms of racial discrimination, began a boycott of local businesses. During the boycott, a young black man was shot and killed in an encounter with Port Gibson police and "sporadic acts of violence ensued." *Id.*, at 902. The following day, boycott leader Charles Evers told a group that boycott violators would be disciplined by their own people and warned that the sheriff "could not sleep with boycott violators at night." *Ibid.* He stated at a second

---

[4] *Claiborne Hardware* involved both monetary damages and an injunction, but that is of no consequence for purposes of the point I am making here: that we have been careful to insulate all elements of speech not infected with illegality.

gathering that "'[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck.'" *Ibid.* In connection with the boycott, there were marches and picketing (often by small children). "Store watchers" were posted outside boycotted stores to identify those who traded, and their names were read aloud at meetings of the Claiborne County NAACP and published in a mimeographed paper. The chancellor found that those persons were branded traitors, called demeaning names, and socially ostracized. Some had shots fired at their houses, a brick was thrown through a windshield, and a garden damaged. Other evidence showed that persons refusing to observe the boycott were beaten, robbed, and publicly humiliated (by spanking).

The merchants brought suit against two groups involved in organizing the boycott and numerous individuals. The trial court found tort violations, violations of a state statute prohibiting secondary boycotts, and state antitrust violations. It issued a broad permanent injunction against the boycotters, enjoining them from stationing "store watchers" at the plaintiffs' business premises; from persuading any person to withhold patronage; from using demeaning and obscene language to or about any person because of his patronage; from picketing or patrolling the premises of any of the respondents; and from using violence against any person or inflicting damage upon any real or personal property. *Id.,* at 893. The Mississippi Supreme Court upheld the assessment of liability and the injunction, but solely on the tort theory, saying that "'[i]f any of these factors—force, violence, or threats— is present, then the boycott is illegal regardless of whether it is primary, secondary, economical, political, social or other.'" *Id.,* at 895.

The legal analysis of this Court proceeded along the following lines:

> "[T]he boycott . . . took many forms. [It] was launched at a meeting of the local branch of the NAACP.

[It was] attended by several hundred persons. Its acknowledged purpose was to secure compliance . . . with a lengthy list of demands for racial equality and racial justice. The boycott was supported by speeches and nonviolent picketing. Participants repeatedly encouraged others to join its cause.

"Each of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments. . . . '[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process.' We recognize that 'by collective effort individuals can make their views known, when, individually, their voices would be faint or lost.'" *Id.*, at 907–908 (quoting *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 294 (1981)).

We went on to say that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected," 458 U. S., at 908, and held that the nonviolent elements of the protesters' activities were entitled to the protection of the First Amendment, *id.*, at 915.

Because we recognized that the boycott involved elements of protected First Amendment speech and other elements not so protected, we took upon ourselves a highly particularized burden of review, recognizing a "special obligation on this Court to examine critically the basis on which liability was imposed." *Ibid.* "The First Amendment," we noted, "does not protect violence," but when conduct sanctionable by tort liability "occurs in the context of constitutionally protected activity . . . 'precision of regulation' is demanded." *Id.*, at 916 (quoting *NAACP* v. *Button*, 371 U. S., at 438). Then, criticizing the Mississippi Supreme Court for "broadly assert[ing]—without differentiation—that [i]ntimi-

dation, threats, social ostracism, vilification, and traduction were devices used by the defendants to effectuate the boycott," 458 U. S., at 921 (internal quotation marks omitted), we carefully examined the record for factual support of the findings of liability. While affirming that a "judgment tailored to the consequences of [individuals'] unlawful conduct may be sustained," we said that "mere association with [a] group—absent a specific intent to further an unlawful aim embraced by that group—is an insufficient predicate for liability." *Id.*, at 925–926. We said in conclusion that any characterization of a political protest movement as a violent conspiracy "must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity." *Id.*, at 933–934. Because this careful procedure had not been followed by the Mississippi courts, we set aside the entire judgment, including the injunction. *Id.*, at 924, n. 67, 934.

## B

I turn now to the Court's performance in the present case. I am content to evaluate it under the lax (intermediate-intermediate scrutiny) standard that the Court has adopted, because even by that distorted light it is inadequate.

The first step under the Court's standard would be, one should think, to identify the "significant government interest" that justifies the portions of the injunction it upheld, namely, the enjoining of speech in the 36-foot zone, and the making (during certain times) of "'sounds . . . within earshot of the patients inside the [c]linic.'" *Ante*, at 772. At one point in its opinion, the Court identifies a number of government interests: the "interest in protecting a woman's freedom to seek lawful medical or counseling services," the "interest in ensuring the public safety and order, in promoting

the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens," the "interest in . . . medical privacy," and the interest in "the psychological [and] physical well-being of the patient held 'captive' by medical circumstance." *Ante,* at 767, 768. The Court says, *ante,* at 768, that "these governmental interests [are] quite sufficient to justify an appropriately tailored injunction to protect them." Unless, however, the Court has destroyed even more First Amendment law than I fear, this last statement must be read in conjunction with the Court's earlier acknowledgment that "[u]nder general equity principles, an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a 'cognizable danger of recurrent violation.'" *Ante,* at 765, n. 3 (quoting *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 633 (1953)). It is too much to believe, even of today's opinion, that it approves issuance of an injunction against speech "to promote the free flow of traffic" *even when there has been found no violation, or threatened violation, of a law relating to that interest.*

Assuming then that the "significant interests" the Court mentioned must in fact be significant enough to be protected by state law (a concept that includes a prior court order), which law has been, or is about to be, violated, the question arises: What state law is involved here? The only one even mentioned is the original September 30, 1992, injunction,[5] which had been issued (quite rightly, in my judgment) in re-

---

[5] JUSTICE SOUTER points out that "petitioners themselves acknowledge that the governmental interests in protection of public safety and order, of the free flow of traffic, and of property rights are reflected in Florida law. See Brief for Petitioners 17, and n. 7 (citing [various Florida statutes])." *Ante,* at 777. This is true but quite irrelevant. As the preceding sentence of text shows, we are concerned here not with state laws in general, but with state laws that these respondents had been found to have violated. There is *no* finding of violation of any of these cited Florida statutes.

sponse to threats by the originally named parties (including petitioners here) that they would "'[p]hysically close down abortion mills,'" "bloc[k] access to clinics," "ignore the law of the State," and "shut down a clinic." Permanent Injunction Findings of Fact ¶¶ 2, 5, 7, 8, App. 6–7. That original injunction prohibited petitioners from:

> "1) trespassing on, sitting in, blocking, impeding or obstructing ingress into or egress from any facility at which abortions are performed in Brevard and Seminole County Florida;
>
> "2) physically abusing persons entering, leaving, working or using any services of any facility at which abortions are performed in Brevard and Seminole County, Florida; and
>
> "3) attempting or directing others to take any of the actions described in Paragraphs 1 and 2 above." *Id.*, at 9.

According to the Court, the state court imposed the later injunction's "restrictions on petitioner[s'] . . . antiabortion message because they repeatedly violated the court's original order." *Ante*, at 763. Surprisingly, the Court accepts this reason as valid, without asking whether the court's findings of fact support it—whether, that is, the acts of which petitioners stood convicted *were* violations of the original injunction.

The Court simply takes this on faith—even though violation of the original injunction is an essential part of the reasoning whereby it approves portions of the amended injunction, even though petitioners denied any violation of the original injunction, even though the utter lack of proper basis for the other challenged portions of the injunction hardly inspires confidence that the lower courts knew what they were doing, and even though close examination of the factual basis for essential conclusions is the usual practice in First Amendment cases, see *Claiborne Hardware*, 458 U. S.,

at 915–916, n. 50; *Edwards* v. *South Carolina,* 372 U. S. 229, 235 (1963); *Fiske* v. *Kansas,* 274 U. S. 380, 385–386 (1927); see also *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485, 517 (1984) (REHNQUIST, J., dissenting). Let us proceed, then, to the inquiry the Court neglected. In the amended permanent injunction the trial court found that

"despite the injunction of September 30, 1992, there has been interference with ingress to the petitioners' facility . . . . [in] the form of persons on the paved portions of Dixie Way, some standing without any obvious relationship to others; some moving about, again without any obvious relationship to others; some holding signs, some not; some approaching, apparently trying to communicate with the occupants of motor vehicles moving on the paved surface; some marching in a circular picket line that traversed the entrance driveways to the two parking lots of the petitioners and the short section of sidewalk joining the two parking lots and then entering the paved portion of the north lane of Dixie Way and returning in the opposite direction. . . . Other persons would be standing, kneeling and sitting on the unpaved shoulders of the public right-of-way. ' As vehicular traffic approached the area it would, in response to the congestion, slow down. If the destination of such traffic was either of the two parking lots of the petitioners, such traffic slowed even more, sometimes having to momentarily hesitate or stop until persons in the driveway moved out of the way." Amended Permanent Injunction ¶ A.

"As traffic slowed on Dixie Way and began its turn into the clinic's driveway, the vehicle would be approached by persons designated by the respondents as sidewalk counselors attempting to get the attention of the vehicles' occupants to give them anti-abortion literature and to urge them not to use the clinic's services. Such so-called sidewalk counselors were assisted in ac-

complishing their approach to the vehicle by the hesitation or momentary stopping caused by the time needed for the picket line to open up before the vehicle could enter the parking lot." *Id.*, ¶ E.

"The . . . staff physician testified that on one occasion while he was attempting to enter the parking lot of the clinic, he had to stop his vehicle and remained stopped while respondent, Cadle, and others *took their time to get out of the way* . . . . This physician also testified that he witnessed the demonstrators running along side of and in front of patients' vehicles, pushing pamphlets in car windows to persons who had not indicated any interest in such literature. . . ." *Id.*, ¶ I (emphasis added).

On the basis of these findings Judge McGregor concluded that "the actions of the respondents and those in concert with them in the street and driveway approaches to the clinic of the plaintiffs continue to impede and obstruct both staff and patients from entering the clinic. The paved surfaces of the public right-of-way must be kept open for the free flow of traffic." *Id.*, Conclusions, ¶ A.[6]

These are the only findings and conclusions of the court that could conceivably be considered to relate to a violation of the original injunction. They all concern behavior by the protesters causing traffic on the street in front of the abortion clinic to slow down, and causing vehicles crossing the

---

[6] In my subsequent discussion, I shall give the Florida trial court the benefit of the doubt, and assume that the phrase "continue to impede and obstruct" expresses the conclusion that petitioners had violated those provisions of the original injunction which prohibited "impeding or obstructing." It is not entirely clear, however, that the Florida court was in fact asserting a violation of the original injunction. As far as the record shows, it assessed no penalty for any such violation; and "impeding and obstructing" can embrace many different things, not all of which (as I shall discuss presently) come within the meaning of the original injunction.

pedestrian right-of-way, between the street and the clinic's parking lot, to slow down or even, occasionally, to stop momentarily while pedestrians got out of the way. As far as appears from the court's findings, all of these results were produced, not by anyone intentionally seeking to block oncoming traffic, but as the incidental effect of persons engaged in the activities of walking a picket line and leafletting on public property in front of the clinic. There is no factual finding that petitioners engaged in *any* intentional or purposeful obstruction.

Now let us compare these activities with the earlier injunction, violation of which is the asserted justification for the speech-free zone. Walking the return leg of the picket line on the paved portion of Dixie Way (instead of on the sidewalk), and congregating on the unpaved portion of that street, may, for all we know, violate some municipal ordinance (though that was not alleged, and the municipal police evidently did not seek to prevent it); but it assuredly did not violate the earlier injunction, which made no mention of such a prohibition. Causing the traffic along Dixie Way to slow down "in response to the congestion" is also irrelevant; the injunction said nothing about slowing down traffic on public rights-of-way. It prohibited the doing (or urging) of *only three things:* (1) "physically abusing persons entering, leaving, working or using any services" of the abortion clinic (there is no allegation of that); (2) "trespassing on [or] sitting in" the abortion clinic (there is no allegation of that); and (3) "blocking, impeding or obstructing ingress into or egress from" the abortion clinic.

Only the last of these has any conceivable application here, and it seems to me that it must reasonably be read to refer to *intentionally* blocking, impeding, or obstructing, and *not* to such temporary obstruction as may be the normal and incidental consequence of other protest activity. That is obvious, first of all, from the context in which the original injunction was issued—as a response to petitioners' threatened

actions of trespass and blockade, *i. e.,* the physical shutting down of the local clinics. Secondly, if that narrow meaning of intentional blockade, impediment, or obstruction was not intended, and if it covered everything up to and including the incidental and "momentary" stopping of entering vehicles by persons leafletting and picketing, the original injunction would have failed the axiomatic requirement that its terms be drawn with precision. See, *e. g., Milk Wagon Drivers,* 312 U. S., at 296; 1 D. Dobbs, Law of Remedies § 2.8(7), p. 219 (2d ed. 1993); 7 J. Moore, J. Lucas, & K. Sinclair, Moore's Federal Practice ¶ 65.11 (2d ed. 1994); cf. Fed. Rule Civ. Proc. 65(d) ("Every order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail . . . the act or acts sought to be restrained"). And finally, if the original injunction did not have that narrow meaning it would assuredly have been unconstitutional, since it would have prevented speech-related activities that were, insofar as this record shows, neither criminally or civilly unlawful nor inextricably intertwined with unlawful conduct. See *Milk Wagon Drivers, supra,* at 292, 297; *Carroll,* 393 U. S., at 183–184.

If the original injunction is read as it must be, there is nothing in the trial court's findings to suggest that it was violated. The Court today speaks of "the failure of the first injunction to protect access." *Ante,* at 769. But the first injunction did not broadly "protect access." It forbade particular acts that impeded access, to wit, intentionally "blocking, impeding or obstructing." The trial court's findings identify none of these acts, but only a mild interference with access that is the incidental by-product of leafletting and picketing. There was no sitting down, no linking of arms, no packing en masse in the driveway; the most that can be alleged (and the trial court did not even make this a finding) is that on one occasion protesters "took their time to get out of the way." If that is enough to support this one-man proscription of free speech, the First Amendment is in grave peril.

I almost forgot to address the facts showing prior violation of law (including judicial order) with respect to the other portion of the injunction the Court upholds: the no-noise-within-earshot-of-patients provision. That is perhaps because, amazingly, neither the Florida courts *nor this Court* makes the slightest attempt to link that provision to prior violations of law. The relevant portion of the Court's opinion, Part II–B, simply reasons that hospital patients should not have to be bothered with noise, from political protests or anything else (which is certainly true), and that therefore the noise restrictions could be imposed *by injunction* (which is certainly false). Since such a law is reasonable, in other words, it can be enacted by a single man to bind only a single class of social protesters. The pro-abortion demonstrators who were often making (if respondents' videotape is accurate) *more* noise than the petitioners, can continue to shout their chants at their opponents exiled across the street to their hearts' content. The Court says that "[w]e have upheld similar noise restrictions in the past," *ante,* at 772, citing *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972). But *Grayned* involved an *ordinance,* and not an *injunction;* it applied to *everyone.* The only other authority the Court invokes is *NLRB* v. *Baptist Hospital, Inc.,* 442 U. S. 773 (1979), which it describes as "evaluating another injunction involving a medical facility," *ante,* at 772, but which evaluated no such thing. *Baptist Hospital,* like *Grayned,* involved a restriction of general application, adopted by the hospital itself—and the case in any event dealt not with whether the government had violated the First Amendment by restricting noise, but with whether the hospital had violated the National Labor Relations Act by restricting solicitation (including solicitation of union membership).

Perhaps there is a local ordinance in Melbourne, Florida, prohibiting loud noise in the vicinity of hospitals and abortion clinics. Or perhaps even a Florida common-law prohibition applies, rendering such noisemaking tortious. But the

record in this case shows (and, alas, the Court's opinion today demands) neither indication of the existence of any such law nor a finding that it had been violated. The fact that such a law would be reasonable is enough, according to the Court, to justify a single judge in imposing it upon these protesters alone. The First Amendment (and even the common law of injunctions, see the Court's own footnote 3) reels in disbelief.

The Court does not even attempt a response to the point I have made in this section, insofar as the injunction against noise is concerned. That portion of its opinion, *ante,* at 772–773, does not even allege any violation of the prior injunction to support this judge-crafted abridgment of speech. With respect to the 36-foot speech-free zone, the Court attempts a response, which displays either a misunderstanding of the point I have made or an effort to recast it into an answerable one. My point does not rely, as the Court's response suggests, *ante,* at 770, upon my earlier description of the videotape. That was set forth just for context, to show the reader what suppression of normal and peaceful social protest is afoot here. Nor is it relevant to my point that "petitioners themselves studiously refrained from challenging the factual basis for the injunction," *ibid.* I accept the facts as the Florida court found them; I deny that those facts support its *conclusion* (set forth as such in a separate portion of its opinion, as quoted above) that the original injunction had been violated. The Court concludes its response as follows:

> "We must therefore judge this case on the assumption that the evidence and testimony presented to the state court supported its findings that the presence of protesters standing, marching, and demonstrating near the clinic's entrance interfered with ingress to and egress from the clinic despite the issuance of the earlier injunction." *Ante,* at 771.

But a finding that they "interfered with ingress and egress . . . *despite* the . . . earlier injunction" is not enough. The

earlier injunction did not, and could not, prohibit all "interference"—for example, the minor interference incidentally produced by lawful picketing and leafletting. What the Court needs, and cannot come up with, is a finding that the petitioners interfered *in a manner prohibited by the earlier injunction.* A conclusion that they "block[ed], imped[ed] or obstruct[ed] ingress . . . or egress" (the terminology of the original injunction) within the only fair, and indeed the only permissible, meaning of that phrase cannot be supported by the facts found.

To sum up: The interests assertedly protected by the supplementary injunction did not include any interest whose impairment was a violation of Florida law or of a Florida court injunction. Unless the Court intends today to overturn long-settled jurisprudence, that means that the interests cannot possibly qualify as "significant interests" under the Court's new standard.

## C

Finally, I turn to the Court's application of the second part of its test: whether the provisions of the injunction "burden no more speech than necessary" to serve the significant interest protected.

This test seems to me amply and obviously satisfied with regard to the noise restriction that the Court approves: It is only such noise as would reach the patients in the abortion clinic that is forbidden—and not even at all times, but only during certain fixed hours and "during surgical procedures and recovery periods." (The latter limitation may raise vagueness and notice problems, but that does not concern us here. Moreover, as I have noted earlier, the noise restriction is invalid on other grounds.) With regard to the 36-foot speech-free zone, however, it seems to me just as obvious that the test which the Court sets for itself has not been met.

Assuming a "significant state interest" of the sort cognizable for injunction purposes (*i. e.,* one protected by a law that has been or is threatened to be violated) in both (1) keeping

pedestrians off the paved portion of Dixie Way, and (2) enabling cars to cross the public sidewalk at the clinic's driveways without having to slow down or come to even a "momentary" stop, there are surely a number of ways to protect those interests short of banishing the entire protest demonstration from the 36-foot zone. For starters, the Court could have (for the first time) ordered the demonstrators to stay out of the street (the original injunction did not remotely require that). It could have limited the number of demonstrators permitted on the clinic side of Dixie Way. And it could have forbidden the pickets to walk on the driveways. The Court's only response to these options is that "[t]he state court was convinced that [they would not work] in view of the failure of the first injunction to protect access." *Ante*, at 769. But must we accept that conclusion as valid—when the original injunction contained no command (or at the very least no *clear* command) that had been disobeyed, and contained nothing even *related* to staying out of the street? If the "burden no more speech than necessary" requirement can be avoided by merely opining that (for some reason) no lesser restriction than *this* one will be obeyed, it is not much of a requirement at all.

But I need not engage in such precise analysis, since the Court itself admits that the requirement is not to be taken seriously. "The need for a complete buffer zone," it says, "*may be debatable,* but some deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." *Ante,* at 769–770 (emphasis added). In application, in other words, the "burden no more speech than is necessary" test has become an "arguably burden no more speech than is necessary" test. This renders the Court's intermediate-intermediate scrutiny not only no *more* stringent than plain old intermediate scrutiny, but considerably *less* stringent.

Another disturbing part of the Court's analysis is its reliance upon the fact that "witnesses . . . conceded that the buffer zone was narrow enough to place petitioners at a distance of no greater than 10 to 12 feet from cars approaching and leaving the clinic," and that "[p]rotesters standing across the narrow street from the clinic can still be seen and heard from the clinic parking lots." *Ante,* at 770. This consideration of whether the injunction leaves open effective, alternative channels of communication is classic, time-place-and-manner-regulation, "intermediate scrutiny" review, see *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989). And in that context it is reasonable. But since in this case a general regulation establishing time, place, and manner restrictions for *all* citizens is not at issue, these petitioners have a right, not merely to demonstrate and protest at some reasonably effective place, but to demonstrate and protest *where they want to and where all other Floridians can,* namely, right there on the public sidewalk in front of the clinic. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State (Town of Irvington),* 308 U. S. 147, 163 (1939). "Whether petitioner might have used some other [forum] . . . is of no consequence. . . . Even if [another] forum had been available, that fact alone would not justify an otherwise impermissible prior restraint." *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 556 (1975).

\*　　\*　　\*

In his dissent in *Korematsu* v. *United States,* 323 U. S. 214 (1944), the case in which this Court permitted the wartime military internment of Japanese-Americans, Justice Jackson wrote the following:

> "A military order, however unconstitutional, is not apt to last longer than the military emergency. . . . But once a judicial opinion . . . rationalizes the Constitution to

> show that the Constitution sanctions such an order, the Court for all time has validated the principle of racial discrimination in criminal procedure and of transplanting American citizens. The principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need." *Id.*, at 246.

What was true of a misguided military order is true of a misguided trial-court injunction. And the Court has left a powerful loaded weapon lying about today.

What we have decided seems to be, and will be reported by the media as, an abortion case. But it will go down in the lawbooks, it will be cited, as a free-speech injunction case—and the damage its novel principles produce will be considerable. The proposition that injunctions against speech are subject to a standard indistinguishable from (unless perhaps more lenient in its application than) the "intermediate scrutiny" standard we have used for "time, place, and manner" legislative restrictions; the notion that injunctions against speech need not be closely tied to any violation of law, but may simply implement sound social policy; and the practice of accepting trial-court conclusions permitting injunctions without considering whether those conclusions are supported by any findings of fact—these latest byproducts of our abortion jurisprudence ought to give all friends of liberty great concern.

For these reasons, I dissent from that portion of the judgment upholding parts of the injunction.

### APPENDIX TO OPINION OF JUSTICE SCALIA

Portions of April 12, 1993, Appearance Hearings Held Before Judge McGregor, Eighteenth Judicial Circuit, Seminole County, Florida:

Page 40:

JANE DOE NO. 6: "Yes, sir. When I heard this injunction, everything in there, as an American—"

THE COURT: "I'm Sorry. I'm not the judge trying it. Those are matters that perhaps you'll want to present at trial."

JANE DOE NO. 6: "I do have a question, too. I'm confused as to why the people who were blockading the clinic who had pro-choice signs were not arrested along with me. They—it appeared to me they were violating the same injunction I was, you know—"

THE COURT: "The Injunction is directed only against certain named Defendants, certain named organizations and those acting in concert with them. Presumably, as you say, the other side would not have been acting in concert with the named Defendants."

JANE DOE NO. 6: "But I was in concert with nobody. I was just an American citizen, defending the right to assemble and to demonstrate."

THE COURT: "Again, perhaps, that would be a matter of defense that you would present at the time of trial."

JANE DOE NO. 6: "So the Injunction only . . . ."

Page 43:

JANE DOE NO. 6: "But I was not in concert with anybody."

THE COURT: "Again, I say that at the time of your trial, perhaps, that would be a defensive matter. Although, I'm told by the Melbourne Police Department that everyone was put on notice that the thirty-six-foot area was a restricted area and when—if you presumably had notice of that and chose to enter, then, you chose to violate the Court's Injunction. That's why you were arrested."

JANE DOE NO. 6: "I don't mean this disrespectfully, but does not the constitutional freedom to be on public sidewalk and to—"

THE COURT: "There is nothing in the constitution that says that anyone is entitled to walk on any sidewalk."

JANE DOE NO. 6: "But I have the right to demonstrate, the right to assembly, the right to religion and its practice and I was praying on the sidewalk. I don't understand—"

THE COURT: "And that will not be denied you, but it is subject to regulation. The Court provided the south shoulder of Dixie Way as an area for that to be done."

Page 93:

MR. QUINTERO: "And who are these Defendants? I have no idea."

THE COURT: "They're set out in the Injunction."

MR. QUINTERO: "Because I'm not working in conjunction with anybody. I don't know anything. I don't belong to any group that is doing absolutely anything like this. I am just a normal Christian that went to pray on the sidewalk."

THE COURT: "Again, those may be defensive matters. I'm saying that you should bring them up first with your lawyer and then at the time of trial."

MR. QUINTERO: "Okay, I would like to formally request to have this injunction so I can look at it while I'm incarcerated and that I can make arrangements to talk to counsel about it."

THE COURT: "Your lawyer knows how to obtain a copy. Copies are available at, again, the branch courthouses in Melbourne and Melbourne City Hall. Copies are available at the Clerk's Office here in Seminole County."

MR. QUINTERO: "At this time I do not have a lawyer and I see it very difficult for me to go to the Melbourne Courthouse being incarcerated."

Page 115–116:

[JOHN DOE NO. 16]: ". . . do with the determination in the Injunctive Order or in the arrest?"

THE COURT: "You know, I wasn't there. I don't know. All I know is that the officer used his perceptions, his eyes, his ears, took note of the activities that were going on and

for reasons, you know, he believed that you were in concert with those that had been enjoined and the Injunctive Order is expanded to include those so that you were subject then to the Injunction."

JOHN DOE NO. 16: "When you issued the Injunctive Court Order did you include what someone might believe about abortion or about their right to assemble there, or let's just say about abortion as a basis for arrest?"

THE COURT: "I considered all of the evidence before me."

JOHN DOE NO. 16: "And would one of those things be, would one of the reasons that I was arrested be because I opposed abortion in that clinic?"

THE COURT: "No."

JOHN DOE NO. 16: "Okay. If I was to stand here, if I was to testify that I did not oppose abortion would that make any difference in my arrest?"

THE COURT: "You can't be unarrested. You have been arrested."

JOHN DOE NO. 16: "What about being charged with violating the Court Order?"

THE COURT: "It will be up to the prosecutor, the State Attorney, to make a charge decision. And sometimes lawyers in representing clients will go to a prosecutor in advance of his charge decision and ask that he, you know, consider additional matters that might cause him to not make such a charge decision. Those are matters lawyers best know how to do."

JOHN DOE NO. 16: "When you issued the Injunction did you determine that it would only apply to—that it would apply only to people that were demonstrating that were pro-life?"

THE COURT: "In effect, yes."

JOHN DOE NO. 16: "Okay, thank you."

THE COURT: "Any other questions?"

JOHN DOE NO. 16: "No."

THE COURT: "Thank you. Did we give him a court date?

"John Doe Number Eighteen."

JOHN DOE NO. 18: "Were there any numbers . . . ."

Pages 119–120:

MR. MACLEAN: "Yes, please, Your Honor."

THE COURT: "Okay. Court will then direct pre-trial release officer to interview and provide the results of the interview to Judge Eaton after 1:00 o'clock today and he will consider that release. Do you wish to be considered for court-appointed counsel?"

MR. MACLEAN: "No thank you."

THE COURT: "Do you have any questions?"

MR. MACLEAN: "Yes, please. Would you extend your gracious offer to reduce the bond for myself also?"

THE COURT: "Surely. Reduce bond to a hundred dollars."

THE CLERK: "Total?"

THE COURT: "Hmm?"

THE CLERK: "Total?"

THE COURT: "No. I can't deal with the—"

THE CLERK: "Eleven hundred?"

THE COURT: "Eleven hundred, yes."

MR. MACLEAN: "Respectfully, sir, where on my arrest report does it allege that I was acting in concert with anyone?"

THE COURT: "It is embodied in the phrase violation of the Injunctive Court Order. But again, this is an arrest report. It is not a formal charge. Presumably within the formal charge there will be that reference, sir."

MR. MACLEAN: "I'm finished with questions, sir, but may I make a statement which I promise you I won't—"

THE COURT: "I can't deal with the statement. In other words, I've got a lot of people to see and the statement may be defensive in nature and it is a matter that should be brought to the trial of the matter."

MR. MACLEAN: "I only wish to thank the Melbourne Police Department and the Sharpes Correctional facility and the people here in Seminole for their gracious and professional treatment of us."

THE COURT: "Thank you in their behalf."

MR. MACLEAN: "Okay, sir."

THE COURT: "John Doe Number Eighteen. This is out of order now."

THE CLERK: "Yes, sir."

THE COURT: "You've been designated as John Doe Number Eighteen. Do you wish to maintain that designation for these proceedings?"